## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

GRAND ISLAND COMMERCE CENTER
JOINT VENTURE,

                  Plaintiff,

v.

TOWN OF GRAND ISLAND, and

TOWN BOARD OF GRAND ISLAND,

                Defendants.

**COMPLAINT**

Civil Action No.: 25-cv- 1404

For their Complaint, Plaintiff states as follows:

## <u>INTRODUCTION</u>

1.     Plaintiff Grand Island Commerce Center Joint Venture, by their attorneys, Rupp Pfalzgraf LLC, brings this action to recover just compensation for the Town of Grand Island's unconstitutional destruction of Plaintiff's long-approved industrial development and the Town's retention and use of a multimillion-dollar sanitary sewer infrastructure that Plaintiff was required to design, fund, and construct.

2.     For decades, the Town repeatedly approved Plaintiff's plans for a light-industrial development exceeding 1.6 million square feet, expressly conditioned upon Plaintiff's construction and dedication of a sanitary sewer district engineered to service that scale of development.  Plaintiff invested millions of dollars in reliance on these approvals and on the Town's consistent representations that the project would proceed.

3.     But after accepting the sewer infrastructure, integrating it into the municipal system, and allowing third-party users to connect, the Town abruptly reversed course for political

reasons.  It stalled Plaintiff's 2020 revised site plan through bad-faith environmental review delays, a targeted regulatory moratorium, and ultimately enacted Local Law No. 2 of 2025 ("Local Law No. 2")—a zoning amendment deliberately crafted to outlaw Plaintiff's project and reduce the permissible floor area to roughly 189,100 square feet.  The Town's own officials publicly admitted the law targeted "one landowner" and was "really passing a law for one person," the Plaintiff.

4.      The Town Board, acting as the final policymaker for zoning and land-use matters, adopted Local Law No. 2 as official municipal policy with the deliberate purpose and effect of destroying Plaintiff's development rights.

5.      This course of conduct—deliberate delay, exploitation of the New York State Environmental Quality Review Act ("SEQRA"), and legislation tailored to eliminate Plaintiff's vested investment-backed expectations—constitutes a non-categorical regulatory taking under the Fifth and Fourteenth Amendments.  The Town's ongoing use of Plaintiff's privately funded sewer district further constitutes unjust enrichment under New York law.

6.      Plaintiff seeks damages, just compensation, attorneys' fees and other expenses, including the cost of this action, together with all accrued interest for these constitutional and equitable violations.

## SUMMARY OF THE CASE

7.      This case concerns the Town of Grand Island's misuse of zoning and environmental regulatory powers to defeat a project it had long encouraged and repeatedly approved.  Between 1991 and 2013, the Town repeatedly approved Plaintiff's development of a 1.65-million-square-foot industrial and office complex following SEQRA review.  Those approvals required Plaintiff to design and construct an oversized sanitary sewer district—Sewer District No. 6—engineered to

accommodate the wastewater flows generated by more than 1.6 million square feet of industrial development.

8.  Relying on the Town's approvals, Plaintiff spent millions of dollars designing and constructing the sewer district, including a duplex pump station, more than 11,000 linear feet of sewer main, and all appurtenant infrastructure.  The Town accepted dedication of the system in 2020, incorporated it into the public sewer network, and began servicing third party properties through it while Plaintiff received none of the benefit of its investment.

9.  When Plaintiff submitted a revised, smaller site plan in 2020—reducing the project from 1.65 million to 1.33 million square feet and thereby decreasing environmental impacts—the Town departed from its decades long position.  Rather than reaffirm that no new SEQRA review was required, as it had in 2013 under materially identical circumstances, the Town initiated a new and protracted SEQRA process.  Plaintiff submitted multiple drafts of a Supplemental Environmental Impact Statement between 2020 and 2025 at considerable expense. Despite this, the Town refused to render a determination, repeatedly shifting requirements to delay the project.

10.  These orchestrated delays were not accidental.  They bought time for the Town Board to respond to political pressure by enacting a zoning amendment—Local Law No. 2— intended to prohibit Plaintiff's development while leaving virtually all other similarly zoned parcels unaffected.  Local Law No. 2 imposed a 350,000-square-foot cap on business campuses in the M-1 district and banned distribution facilities.  The Town's own Planning Board President stated during a meeting that the law was designed to target a single parcel: Plaintiff's 207-acre property.

11.  Local Law No. 2's definition of "Business Campus" further manipulates the regulatory framework by aggregating parcels connected by common utilities—including sewer

infrastructure—which ensures Plaintiff's parcel is combined with neighboring users of the sewer system Plaintiff built.  Upon information and belief, the Plaintiff has neighboring users with a totally cumulative square footage of approximately 160,900-square-feet.  This reduces Plaintiff's allowable development footprint below the 350,000-square-foot cap to roughly 189,100-square-feet and leaves Plaintiff with about 1.9% of its development potential.  The oversized sewer infrastructure—constructed solely because the Town required it—now serves almost exclusively third-party users, leaving Plaintiff without the ability to realize any return on its investment.

12.    Through this intentional sequence of reversal, delay, and targeted legislation, the Town deprived Plaintiff of practically all economically viable use of its property, acted inconsistently with its own 2018 Town Comprehensive Plan, and appropriated the benefits of Plaintiff's sanitary sewer investment.

13.    This action seeks just compensation for that taking and restitution for the Town's unjust enrichment.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as Plaintiff's claims arise under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983.

15.    This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over Plaintiff's state law claims as these claims are so related to the federal claims that they form part of the same case or controversy.

## VENUE

16.    Venue is proper in the Western District of New York pursuant to 28 U.S.C. § 1391(b) because Defendant resides within this district and a substantial part of the events or omissions giving rise to the claims occurred within this district.

## PARTIES

17.    Plaintiff Grand Island Commerce Center Joint Venture is a general partnership existing under the laws of the State of New York with their headquarters at 5554 Main Street, Williamsville, NY 14221.

18.    Defendant, the Town of Grand Island, was and is a municipal corporation duly organized and existing under the laws of the State of New York and has an address of 2255 Baseline Road, Grand Island, New York 14072.

19.    Defendant, Town Board of the Town of Grand Island, is the final policymaking authority for zoning matters in the Town of Grand Island and has an address of 2255 Baseline Road, Grand Island, New York 14072.

## NOTICE OF CLAIM

20.    On November 17, 2025, Plaintiff timely filed a Notice of Claim with the Town of Grand Island, setting forth the factual basis for its unjust enrichment claim.  Plaintiff has satisfied all procedural prerequisites, to the extent any apply, for asserting its supplemental state law claims in this Court.

## FACTUAL BACKGROUND

A. **1990-2013: The Town's Repeated Approvals Established Clear, Reasonable, and Investment-Backed Expectations for Large-Scale Industrial Development**

21.     Throughout 1990 and 1991, Plaintiff assembled and purchased approximately 207 acres of vacant and undeveloped land in the Town of Grand Island, New York.  The 207 acres consisted of 141 acres of land in an M-1 zoning district and 66 acres of that land in an R-1A zoning district.[1]

22.     The site spans from Long Road at the northernmost point to Bedell Road at the southernmost point and is bordered by Interstate 190 on the east for approximately 3,500 feet.

23.     Plaintiff carefully selected this property based on its location relative to Interstate 190.  Plaintiff's plan from the beginning was to leverage this site's proximity to an Interstate 190 exit by building a light-industrial facility—known initially as the "Grand Island Commerce Center"—to serve as a regional hub for the distribution of goods.  This close proximity to an interstate exit provided an ease of access for the distribution of products.

24.     Plaintiff is uniquely qualified to pursue large distribution projects, having experience owning and completing municipal and environmental reviews for a total of 4.5 million square feet of distribution projects on more than 300 acres of light-industrial zoned land in New York State in the past 5 years.  These distribution facilities have been located in communities with similar population sizes to that of Grand Island, and within zoning districts that are consistent with that of Grand Island's M-1 zoning district.

25.     Development of light-industrial property requires site plan approval and environmental review under SEQRA from the relevant authority.  Here, that authority was

---

[1] In Grand Island, New York an M-1 zoning district is for "Light Industrial and Research" uses and R-1A zoned land is for "Low Density Single Family" uses.

Defendant Town Board. Once a project receives site plan approval and a SEQRA determination, the developer may obtain building permits and begin construction.

26.    Typically, developers do not need a tenant in place to begin the site plan or SEQRA process; however, seeking building permits involves detailed construction drawings and final engineering plans tailored to the actual use and tenant specifications; Therefore, in most cases, developers prefer to have at least one committed tenant, often referred to as an anchor tenant, before seeking a building permit and beginning construction.

27.    Accordingly, it is not uncommon for a developer such as the Plaintiff to obtain site plan approval without a tenant and later obtain a building permit once an anchor tenant is secured.

28.    Historically, Plaintiff has received all required municipal approvals and environmental review approvals for similar projects in New York involving distribution facilities within 79 days on average from submission of a site plan application and full environmental assessment form.

29.    In 1990, Plaintiff submitted a site plan application for the Grand Island Commerce Center to Defendant Town Board, proposing a total of approximately 1.65-million-square-feet of office and light-industrial space. This 1.65 million-square-foot facility was comprised of 1.19-million-square-feet of light industrial use space and 459,000-square-feet of office space.

30.    In 1991, this project underwent a full environmental review under SEQRA, with Defendant Town Board serving as the lead agency. Plaintiff spent roughly $50,000 to conduct the SEQRA review. The review concluded in less than one year, with the Town Board finding the project was consistent with the Town's Comprehensive Plan and zoning regulations. The Town Board then issued a Final Environmental Impact Statement, outlining all environmental impacts of the project.

31.     The Town Board's review also concluded that this project would require the creation of a dedicated sanitary sewer district (Sewer District No. 6) within Plaintiff's land that was commensurate with the needs of 1.65 million square feet of economic development.

32.     Plaintiff agreed to design and construct this sewer infrastructure with private funds and dedicate it at no cost to the Town of Grand Island upon completion—an extraordinary concession that would later prove central to this dispute.  This was also the first and only time the Town of Grand Island has adopted a Sewer District without cost and paid for by a land developer.

33.     On December 30, 1991, the Town Board, as a part of a single motion, voted to approve Plaintiff's site plan for 1.65 million square feet of development, establish Sewer District No. 6 in the Town of Grand Island with no expense to the Town, and accept the SEQRA "Findings Statement" for the Plaintiff's site plan.

34.     Due to market conditions and simultaneously occurring developments across the country, Plaintiff deferred seeking building permits and beginning construction of this project until suitable anchor tenants could be secured.

35.     Despite not yet securing an anchor tenant or obtaining building permits, Plaintiff proceeded in good faith to build the sewer district and advance the Grand Island Commerce Center development.

36.     Specifically, shortly after obtaining site plan approval, Plaintiff installed a sanitary sewer sleeve under Interstate 190 to provide the path for the sanitary sewer infrastructure to cross the highway in anticipation of Plaintiff's development.

37.     By 2007, Plaintiff had already committed $176,000 for the sleeve installation and $290,000 in other sewer-related expenses

38.    In 2012, following several meetings with Town officials, Plaintiff rebranded the project as the "Grand Island Gateway Center" and submitted a new site plan application proposing to begin construction of the sewer infrastructure and service roads.  The project continued to contemplate an approximately 1.65-million-square-foot development.

39.    On June 28, 2012, Daniel Spitzer, Attorney for the Town of Grand Island, confirmed to New York State Department of Environmental Conservation that no supplemental SEQRA review was necessary for the Grand Island Gateway Center, explicitly stating that the project, "does not differ materially from the original project."

40.    On June 17, 2013, Defendant Town Board, following Mr. Spitzer's advice, again approved the site plan—reaffirming its prior findings and confirming that no new environmental review was required for the project.

**B.    2013 – 2020: Plaintiff Invested Millions—Including Construction of a Town-Required No Cost Sewer District—In Reliance on the Town's Longstanding Approvals Thereby Creating Investment-Backed Expectations**

41.    Between 2013 and 2020, Plaintiff proceeded, as required, with construction of the sanitary sewer district infrastructure designed to support the full 1.65-million-square-foot buildout with additional capacity for the sewer to allow for growth on Plaintiff's land.

42.    In 2018, while still searching for an anchor tenant, Plaintiff, with contribution from an out of district user, began constructing the bulk of the sanitary sewer infrastructure per their agreement with Defendants.

43.    Specifically, Plaintiff invested millions of dollars in sewer infrastructure, including a state-of-the-art duplex pump station, 11,000 linear feet of 6-inch sanitary sewer main capable of serving more than one million square feet of development, and the approximately 3 acres of land necessary to construct, service, and maintain the infrastructure. Plaintiff invested this time and

incurred this expense with the understanding that it would serve the project as approved by Defendants in 1991 and again in 2013.

44.    This sanitary sewer infrastructure was specifically designed and engineered to support the full buildout of a 1.65-million-square-foot light-industrial complex with additional capacity for future site expansion and to allow others to use the system. Its capacity, pipe sizing, and pump station specifications were approved and built to accommodate the wastewater flow and service demands of a large-scale, multi-building industrial/distribution complex consistent with Defendants' prior approvals.

45.    In 2019, Plaintiff completed the construction of this sanitary sewer infrastructure.

46.    In 2020, the sewer infrastructure was offered for dedication to Defendants and on May 18, 2020, the Town Board voted to receive the offer of dedication of the deed to the Sewer Works and execute a quit claim deed accepting title to be held by the Town in perpetuity.

47.    Plaintiff planned and constructed the sanitary sewer infrastructure in good faith, relying on Defendant Town Board's representations, its longstanding cooperation, and with the expectation that Defendant Town Board would treat Plaintiff fairly and allow the project to move forward in accordance with applicable laws and prior approvals.

**C.  2013 – 2020: Plaintiff Made Good Faith Efforts to Obtain an Anchor Tenant and Develop their Property**

48.    While this planning and construction of the sewer district was taking place, Plaintiff devoted substantial resources to pursuing an anchor tenant and planning phased construction of the Grand Island Gateway Center.

49.    Most notably, between 2019 and 2020, Plaintiff engaged in serious discussions with a large international distribution center to serve as an anchor tenant, a permitted use within the M-1 zoning district.

50.    Ultimately, the international distribution company withdrew their application to occupy this property because, upon information and belief, the development restrictions and costs imposed by the Town of Grand Island and Erie County New York became onerous.

51.    Strikingly, once the distribution company withdrew its application, another developer secured full site-plan and SEQRA approvals in Niagara County in under 180 days to construct a 3.5-million-square-foot warehouse for the same company only four miles from Plaintiff's property.  This efficiency stands in stark contrast to the five years of delays ultimately imposed by Defendants on Plaintiff.

52.    Upon information and belief, Defendants seized upon public opposition to the large international distribution center to obstruct and delay Plaintiff's site plan review, acting not in accordance with lawful standards but to impede Plaintiff's project.

**D.    2020-2025: The Town's Bad-Faith SEQRA Delays Imposed Severe and Unreasonable Economic Burdens on Plaintiff's Fully Approved Project**

53.    Despite Plaintiff building the sanitary sewer infrastructure in good faith predicated on their prior agreements, Defendants did not hold up their end of the bargain.

54.    Instead, Defendants caused a series of unnecessary and tactical delays designed to frustrate Plaintiff's project from going forward while simultaneously allowing at least one unauthorized private user to connect to the sewer system—reaping substantial benefits from Plaintiff's private investment while simultaneously obstructing Plaintiff's project.

55.    In 2020, Plaintiff proposed revising the Grand Island Gateway Center project from a multi-year construction project with eight multi-story buildings with a cumulative area of approximately 1.65 million square feet to one large single-story building with a total square footage of approximately 1.33 million square feet that would be constructed within 18 months instead of 10 years and would require no zoning variances.

56.     Plaintiff's plan aligned with the 2018 Town of Grand Island Comprehensive Plan.[2] As stated in the Comprehensive Plan, one of the objectives to carry out the goal of Economic Development in the Town was to "Encourage development and redevelopment of commercial and industrial sites that are visually attractive through landscaping and high-quality design elements to create a positive investment environment and attract additional ventures."

57.     Plaintiff's plan also aligned with the strong market demand for large distribution buildings on industrial zoned property over 100 acres.  Plaintiff's property was one of the only suitable sites in Western New York capable of accommodating large distribution users and large economic development projects.  Since the 2020 submission of the updated project, there are likely no other suitable sites of this size and location available in Western New York.

58.     On November 13, 2020, Plaintiff submitted this proposed 1.33-million-square-foot site plan and environmental assessment form to Defendant Town Board and presented their proposal to the Town Planning Board and the Conservation Advisory Board in early 2021.

59.     The new proposed plan involved a significantly smaller environmental impact than the previously approved site plans.

60.     Specifically, the total building square footage was reduced from 1.6 million square feet to 1.33 million square feet.  The anticipated traffic trips per day were reduced from 9,072 trips to 6,598 trips.  The construction period was also reduced from approximately 10 years to an anticipated 18 months.  There were no other material changes from the original plan to the new plan that would have created any additional environmental impacts.

---

[2] Per the terms of the 2018 Comprehensive Plan, "the purpose of this Comprehensive Plan is to define the community's vision for the Town of Grand Island in the form of a physical plan to organize and control natural growth and to provide the framework for achieving the community's goals and objectives.  It is designed to be used by the community as a tool for reviewing proposed projects and as a guide in determining the best use of a piece of property.

61.     On December 5, 2020, Plaintiff presented their site plan during a meeting organized by members of Defendant Town Board and moderated by the Town Engineer.  Others in attendance included various department heads and members of the Town's Advisory Board.

62.     During this December 5th meeting, Ronald Milks, a Town Code Enforcement Officer and Head of the Town Building Department, stated that Plaintiff's 1.33-million-square-foot site plan appeared to meet all of the Town's zoning codes and would not require any variances.  Plaintiff responded that they were hopeful they would receive all necessary approvals by January 2021, so the building process could begin in the spring with the first tenant occupying the property in the summer of 2022.

63.     On March 9, 2021, Plaintiff sent a letter to the Town Supervisor explaining that the proposed 1.33-million-square-foot project would have no new or materially different environmental impacts than the 1991 or 2013 plans—and, in fact, would result in fewer impacts overall.

64.     Despite this smaller footprint and lower environmental impact, on June 21, 2021, Defendant Town Board determined after a single meeting that a new SEQRA environmental review was necessary.  This decision was inconsistent with the 2013 decision to not conduct a new SEQRA review of Plaintiff's last updated site plan.

65.     Between 2020 and 2025, Plaintiff pursued site plan approval for this project by going through the SEQRA process with Defendant Town Board again serving as the lead agency.

66.     Between February 2022 and May 2022, Plaintiff met with the then-Town Supervisor and attorney Spitzer.  During these meetings, the Town Supervisor and Mr. Spitzer requested a number of significant alterations to the proposed site plan, including altering the layout of the site plan, altering the location of infrastructure, reducing the cut-and-fill earthwork for the

project, and reducing the depth of stormwater retention ponds. These changes required significant monetary expense to accomplish; however, Plaintiff complied with these request and updated the site plan to adhere to these requirements. Plaintiff then met with the Town Supervisor and Mr. Spitzer who agreed that their requests were met by the new site plan and layout.

67.     On October 7, 2022, Plaintiff submitted its first Draft Supplemental Environmental Impact Statement to Defendant.

68.     Between 2022 and 2025, Plaintiff submitted three iterations of the Draft Supplemental Environmental Impact Statement and four iterations of its Final Supplemental Environmental Impact Statement in response to serial, shifting demands by the Defendant.

69.     Despite these multiple submissions, which cost the Plaintiff over $500,000, and the significant passage of time, Defendant Town Board failed to file a Final Supplemental Environmental Impact statement or take any definitive action on the project applications.

70.     Ultimately, Defendants delayed and deferred approving Plaintiff's site plan for approximately five years. This delay was excessive especially when compared to the first site plan, which was approved in less than 12 months despite the new project having a demonstrably lower environmental impact. This delay was also excessive when compared with the 4.5 million square feet of comparable distribution projects in New York State, in which Plaintiff has successfully received approval in less than 3 months on average.

71.     Upon information and belief, this excessive delay in reviewing Plaintiff's SEQRA applications was not due to legitimate environmental concerns but was rather a product of public pressure to not allow any development of Plaintiff's property to proceed. Upon information and belief, public sentiment in the Town of Grand Island turned against any development of Plaintiff's property.

72.     Facing public opposition, Defendant capitulated to political pressure and abandoned its duty to adjudicate the application on its merits, choosing delay over decision, freezing this project in a bureaucratic limbo, despite voting to accept dedication of Plaintiff's sewer infrastructure.

73.     In 2024, Defendant Town Board issued a 6-month moratorium on considering applications for commercial space over 25,000 square feet.  Upon information and belief, this moratorium was targeted at Plaintiff and its purpose was to delay adjudication of Plaintiff's proposed site plan so Defendant could pass a new zoning law—known then as Local Law No. 6 of 2023 but would later be passed as Local Law No. 2—that would prevent Plaintiff from developing their property.

E.  **2025: Local Law No. 2 Was a Targeted, Retroactive Government Action Designed to Destroy Plaintiff's Development Rights**

74.     The orchestrated delays outlined above served a calculated purpose.  While professing to conduct environmental review, the Defendant, weaponized the SEQRA process, deliberately and in bad faith delayed adjudication of Plaintiff's duly submitted site plan application to allow sufficient time to enact a zoning amendment, known as Local Law No. 2, that would, by design, outlaw Plaintiff's proposed facility as well as the buildings shown on the previously approved 1991 and 2013 site plans.

75.     Local Law No. 2, which amends Chapter 407 of the Zoning Code of the Town of Grand Island, limited the total gross floor area of all buildings on a Business Campus, whether made up of one or more lots, in the M-1 zoning district to a maximum 350,000 square feet and further prohibited distribution facilities from operating in the M-1 zoning district.

76.     Importantly, the definition of a "Business Campus" compounded the anticipated square footage restrictions.  The law defines a Business Campus as "one or more contiguous or

15

non-contiguous lots, where separated by a public or private roadway, for one or more common business purposes," and specifies that lots "do not need to be held in common ownership."

77.     The law directs that determining whether a lot is part of the Business Campus requires "an evaluation for the proposed use and its relationship to the uses on the other lot(s)," considering factors such as "the nature of the uses, use of common driveways and parking, use of common utility and stormwater infrastructure, and site design, operations, and functionality."  By including "use of common utility and stormwater infrastructure" as a factor, this definition enables the Town to treat separate, independently owned parcels sharing the same sanitary sewer system as part of a single business campus.

78.     By 2025, Plaintiff's sewer infrastructure already served neighboring properties, including a hotel and an industrial facility with a cumulative total square footage of approximately 160,900-square-feet. Therefore, the Business Campus provision aggregates those properties with Plaintiff's parcel, thereby reducing Plaintiff's permissible building area to roughly 189,100-square-feet and further depriving Plaintiff of practically all economically viable use of its property. This Business Campus definition invites selective enforcement and exemplifies the Town's intent to unfairly target Plaintiff's property.

79.     Additionally, Local Law No. 2 does not merely limit individual building size to 350,000 square feet; it also prohibits a property owner from subdividing a parcel or phasing development to construct multiple 350,000-square-foot buildings.  In effect, the law bars any large-scale industrial development on a single tract, regardless of configuration.

80.     Local Law No. 2's prohibition on subdividing parcels prevents Plaintiff from selling vacant portions of its property and forces Plaintiff to retain large tracts of land that the law renders undevelopable.

81.    Plaintiff's 207-acre property has an allowable maximum building coverage of roughly 9.8 million square feet, more than fifty-one times the restricted building size of Local law No. 2.  Stated differently, Local Law No. 2 restricted Plaintiff to use approximately 1.9% of their maximum allowable space, effectively barring any productive use on the remaining 98% of the property.

82.    Local Law No. 2 turned the Town's decade-long promises into a bait-and-switch, giving the Town a free sewer district while stripping Plaintiff of the project the sewer was built to support.

83.    As mentioned above, the sewer infrastructure built by Plaintiff was designed to accommodate a 1.65-million-square-foot light-industrial complex with additional capacity to allow room for growth.  Under Local Law No. 2, Plaintiff is now limited to a roughly 189,100-square-foot facility—about eleven percent of the project for which the sewer system was designed. The infrastructure is therefore vastly oversized and economically inefficient for any development now permitted on the property.

84.    The Town nonetheless continues to benefit from this capacity, using it to serve other properties and third-party users, even as Plaintiff is precluded from realizing the purpose for which the system was built.

85.    In fact, the Town has unfairly benefited from this excess capacity as they have, upon information and belief, allowed at least one unauthorized private user to connect to this system.

**F.  The History of Local Law No. 2 Confirms Its Targeted and Improper Regulatory Character**

86.    Local Law No. 2 was not a broad land-use measure enacted for the public good—it was a precisely crafted weapon targeted squarely at Plaintiff and designed to stop its project alone.

87.    The targeted nature of Local Law No. 2 was made clear during Town Planning Board meetings that discussed the proposed law.  On or about July 14, 2025, the Town of Grand Island Planning Board held a meeting to discuss, among other things, what was then referred to as proposed Local Law No. 6 (later enacted as Local Law No. 2).

88.    The following people attended: David Bruno, Brad Bowman, David Duchscherer, Sandra Lare, Norm Stessing, Jennifer Pastier, Amy Stockinger, Scott Hammond, Craig Eddy, Town Supervisor Peter Marston and Town Board member Thomas Digati.

89.    During this July 14 meeting, Defendant's own officials admitted the true purpose of the law.  Specifically, Planning Board President David Bruno stated:

> "For a 350,000 square foot, you're going to need 8 acres of land to build that building and then roughly another 8 acres for parking and whatnot.  So that's like 16 acres.  That's this law is going to pull in at 32 acres.  So, anyone 32 acres or larger would be this law, which currently we have, if I'm correct, nine parcels over 30 acres.  8 of those parcels are already got stuff built on them and I think the one car dealership is loaded with wetlands.  That's still available.  So that brings it down to one parcel that's blank…Huntress."

90.    Mr. Bruno was referring to Plaintiff's CEO and President William Huntress and the property at issue in this case.

91.    Mr. Bruno went on to state "We're targeting one landowner… we're really passing a law for one person" referring again to Mr. Huntress.  Another member agreed, stating, "We're going after one guy."

92.    These candid admissions confirm that Local Law No. 2 was crafted and enacted solely to prevent Plaintiff from developing its property.

93.    At the end of the July 14 meeting, the Planning Board voted to disapprove Local Law No. 2.

94.    Despite these admissions, on August 19, 2025, the Town Board, ignored the Planning Board's recommendation and the Erie County Environment and Planning Board's countless recommendations to reject the law and adopted it anyway.

95.    The Town Board acted as the final policymaking authority for zoning matters in the Town of Grand Island.

96.    This zoning change had a catastrophic impact on Plaintiff by reducing their square footage to approximately 14% of their 1.33-million-square-foot project, 11% of the development that was approved in 1991 and 2013, and to approximately 1.9% of the allowable building coverage on the property.

97.    Plaintiff honored its obligations in full, giving up its land and constructing a sanitary sewer district—an infrastructure system sized to serve a greater than 1.65-million-square-foot facility.  Defendant accepted this dedication, integrated the system into its municipal network, and extended service to other users.  Yet after reaping the benefit of this infrastructure, Defendant stripped Plaintiff of the only use that justified that investment.

98.    By its own words and actions, the Defendant made clear that Local Law No. 2 was designed to stop the Plaintiff and no one else.

99.    The result was the destruction of a long-approved project, the nullification of decades of investment-backed expectations, and the Defendants' use of major sewer infrastructure that Plaintiff was compelled to design, construct, and surrender without compensation.

100.    Through this calculated sequence of delay, reversal, and targeted legislation, the Defendants deprived Plaintiff of practically all of the economically viable use of its property while unjustly retaining the benefits of Plaintiff's investment.

## FIRST CAUSE OF ACTION

**VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION**
**UNLAWFUL NON-CATEGORICAL TAKING UNDER 42 U.S.C. § 1983**
**Against All Defendants**

101.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

102.    For the reasons stated above, Local Law No. 2 of 2025 violates the Takings Clause of the Fifth Amendment to the United States Constitution, as incorporated against the States by the Fourteenth Amendment.

103.    The Takings Clause safeguards property owners from government action that deprives them of the beneficial and economic use of their property without just compensation. This protection extends to regulatory measures that, while not formally expropriating title, effectively strip property of its value and intended use.

104.    Plaintiff acquired the property with legitimate, distinct, and well-founded investment-backed expectations that it would be permitted to develop the site with facilities exceeding 189,100-square-feet in size.

105.    Defendants repeatedly confirmed those expectations, having twice approved Plaintiff's plans to construct facilities totaling approximately 1.65-million-square-feet.

106.    In reliance on those approvals and Defendants' express commitments, including affirmations made after the passage of the 2018 Town Comprehensive Plan, Plaintiff constructed a dedicated public sanitary sewer district capable of servicing a 1.65-million-square-foot facility.

107.    This dedicated sewer district, funded by Plaintiff represents a substantial and irreversible investment made in reliance on Defendants' prior approvals and cooperation.

108.    Such an extensive infrastructure system is wholly unnecessary and economically wasteful for a project limited to 189,100 square feet, underscoring the extent of Plaintiff's reliance on Defendants' prior representations and development approvals.

109.    Rather than adjudicate Plaintiff's pending site plan application in good faith, Defendants deliberately delayed its review to allow time to enact Local Law No. 2 of 2025—a targeted zoning amendment designed to prevent Plaintiff's proposed distribution center from serving any large-scale logistics tenant.

110.    Defendant Town Board of Grand Island, acting as the final policymaking authority on zoning matters for Defendant Town of Grand Island, enacted a zoning amendment that deprived Plaintiff of practically all economically beneficial use of its property, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

111.    Defendant Town of Grand Island is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because Local Law No. 2 was enacted by the Defendant Town Board—the final policymaking authority for zoning and land-use matters—and therefore constitutes official municipal policy.  The constitutional violations alleged herein were caused directly by this municipal policy.

112.    Defendants' enactment of Local Law No. 2 of 2025 and related zoning amendments constitutes a regulatory taking under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).

113. The economic impact of Defendants' actions is devastating, destroying the feasibility of Plaintiff's planned one-million-plus-square-foot distribution facility and preventing any legitimate development of the property.

114. The zoning amendments unlawfully interfere with Plaintiff's reasonable, investment-backed expectations, including construction of a Sanitary Sewer District and over $500,000 spent on SEQRA reviews, which were grounded in decades of planning, formal approvals, and substantial reliance expenditures.

115. Defendants' conduct reflects more than mere poor judgment—it represents an intentional misuse of governmental authority to defeat a private development Defendants endorsed on multiple occasions. This selective and punitive treatment exceeds the bounds of legitimate land-use regulation and falls squarely within the constitutional protections against regulatory takings.

116. The character of Defendants' conduct is particularly egregious—it was targeted, retaliatory, and undertaken in bad faith. Rather than regulate broadly for legitimate public purposes, the Defendants singled out Plaintiff's property, disregarded prior approvals, imposed retroactive restrictions, and appropriated the benefits of Plaintiff's privately funded infrastructure by allowing third parties to connect.

117. Through this calculated and punitive course of conduct, Defendants have deprived Plaintiff of practically all economically viable use of its property, both temporarily and permanently, without just compensation.

118. As a direct and proximate result of Defendants' unconstitutional actions, Plaintiff has suffered substantial financial harm and is entitled to just compensation in an amount to be

proven at trial, including the diminution in value of its property, lost economic opportunity, and consequential damages.

119.    Plaintiff's non-categorical regulatory takings claim is ripe because Defendants have reached a final, definitive position regarding the application of Local Law No. 2 to Plaintiff's property.

120.    Pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred in vindicating its constitutional rights under the Fifth and Fourteenth Amendments.

## SECOND CAUSE OF ACTION

### UNJUST ENRICHMENT
### IN VIOLATION OF NEW YORK STATE LAW
### Against Defendant Town of Grand Island

121.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

122.    Defendant Town of Grand Island has been unjustly enriched by Plaintiff's significant investment of money to design, construct, and dedicate a sewer district that directly benefits Defendants and their residents.

123.    Defendant Town of Grand Island's enrichment occurred at Plaintiff's expense, as Plaintiff bore the costs of constructing and maintaining the sewer infrastructure now owned and utilized by Defendant.

124.    Equity and good conscience prohibit Defendant Town of Grand Island from retaining the substantial benefits conferred by Plaintiff's expenditures without providing restitution or compensation.

125.    To the extent required by N.Y. Gen. Mun. Law §§ 50-e and 50-i, Plaintiff has timely filed and served the requisite notice of claim upon Defendant, or alternatively asserts that such

requirements are inapplicable to this action properly brought in federal court under supplemental jurisdiction.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

126. **On the First Cause of Action (Regulatory Taking under the Fifth and Fourteenth Amendments)**: Enter a money judgment against Defendants in an amount to be determined at trial, representing just compensation for the taking and deprivation of the economically viable use of Plaintiff's property.

127. **On the Second Cause of Action (Unjust Enrichment under New York Law)**: Enter a money judgment against Defendants in an amount to be determined at trial, representing the value of the sewer district and related infrastructure conferred upon Defendant.

128. **Attorneys' Fees and Costs**: Award Plaintiff its reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. §§ 1983 and 1988, and other applicable law.

129. **Further Relief**: Grant such other and further relief, whether legal or equitable, as the Court deems just and proper.

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiff hereby requests a trial by jury on all issues so triable.


Dated: December 18, 2025
      Buffalo, New York

                    **RUPP PFALZGRAF** LLC
                    *Attorneys for Plaintiff*

                    By:      */s/Jonathan Cantil*
                              R. Anthony Rupp III, Esq.
                              Jonathan Cantil, Esq.
                     424 Main Street
                     1600 Liberty Building
                     Buffalo, New York 14202
                     (716) 854-3400
                     Rupp@RuppPfalzgraf.com
                     Cantil@RuppPfalzgraf.com